LEHIGH VALLEY R. CO. v. BROOKLYN EASTERN DIST. TERMINAL.

(Circuit Court of Appeals, Second Circuit. May 9, 1916.)

No. 259.

SHIPPING ☞110—SINKING OF CAR FLOAT IN LOADING—IMPROPER METHOD OF LOADING.

The sinking of a car float while being loaded with loaded cars at a float bridge of respondent railroad company under direction of its train conductor *held* due to his negligent method of loading, for which respondent was liable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 420, 421; Dec. Dig. ☞110.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Brooklyn Eastern District Terminal against the Lehigh Valley Railroad Company. Decree for libelant, and respondent appeals. Affirmed.

The following is the opinion below of Learned Hand, District Judge:

I think the float was seaworthy. She was still a young boat, made with extra strength, and she had been thoroughly overhauled within three months. The last master who was available swore that she was dry when he left her the day before, and there is the evidence of the tug master that she did not list when she was towed over to the Jersey pier, showing that she had not a great quantity of water. That there was some water in her I can well believe, but the bridge tender's estimate of seven inches, based upon his ear, can certainly not count for much as evidence. The evidence against her condition comes only from Ericson's observations, from vague talk about former unspecified trouble in loading her, and from the fact that she was changed to a two-track float later. Ericson's testimony was honest, and probably it was accurate; but it was after the accident and the inferences to be drawn from it rest only in expert opinion. Perhaps it is true that the float yielded too much in the middle when fully loaded; but that did not cause the accident, because she was not loaded so much at the time she sank. If it be suggested that she had taken in water on the way over while she was loaded, then she would have continued to fill on her way back and every time she was loaded, and I can only say that, if so, she would not have been available at all for the use she constantly and successfully filled. That argument proves too much. Finally, as to the change in her use after the accident, the law has always declined to admit such evidence, since it involves

a new issue, which has no necessary relation to the issue in suit. We have no means of knowing why the boat was changed. It may be that this accident showed that under circumstances which might arise, owing to the railroad's mismanagement, she was subject to damage, and that one track was taken off against its recurrence. Whatever the reason, it seems to me not to overbalance the testimony given in favor of the float, especially as I shall show that she developed no weakness, except under abnormal conditions, which she was in my judgment not to be expected to endure.

This involves Meyers' handling of his train. Having 15 cars, his plan was to put 5 on each track, which was, of course, the proper way. He backed his train down on the center track to the bumpers and cut off the last 5 cars. Then he tried to pull off the rest, of which 2½ were on the float and 2½ on the bridge. This he could not do, so he cut off the second string of 5, took the last 5, and backed them down onto the port track, so that 2½ were on the float and 2½ on the bridge. Then he went over to pull off the second string of 5. This he was again unable to do, but meanwhile the float gave evidence of distress, and, while he was trying to get off the port string, filled through her hatches and sank. Meyers' plan had been to run the second string half on the starboard track and half on the bridge. Then he meant to run the whole port string onto the port track, perhaps to the bumper, but certainly far enough aft not to put the float down by the head. Then he could go again to his starboard string and back that to the proper place on the float. Thus he would have never had more than 2½ cars unbalanced upon either of the side tracks, and she would not have had an undue list to port or starboard. When Meyers found that he could not pull off his second string, but was forced to leave it on the cut-off, he concluded that he ought not to run the whole third string of 5 onto the port track for fear of giving her too great a list to port. The second string should have been on the starboard track, where they would have exerted their whole weight in a turning movement to starboard; in fact, they were on the cut-off, where they exerted a much feebler moment.

Meyers' reasoning was therefore perfectly sound and prudent, so far as the thwartships list was concerned. What he forgot was the effect of his disposition upon putting the float down by the head. We need not agree with Clark that he should not leave in any case any part of his second string on the bridge. We may grant the propriety of his contemplated plan, but we must remember that his execution was not in accordance with it. Had he put the second string half on the bridge and, half on the float, the float's bow would have been depressed by the weight of 2½ cars and by so much of the weight of the other 2½ as the buoyancy of the pontoon could not counteract. This we may suppose would not have been too much, Clark to the contrary notwithstanding. If in that posture Meyers had run his third string upon the port track, he would have run it right aft to the bumpers, or at least to where it balanced amidships. Thus he would have added no turning moment to set the float down by the head. It is true that as the third train was passing it would have set her down; but the string was to pass right on to its position of rest, and in that position it would have added nothing to the turning moment forward and aft.

Instead of this, however, Meyers let the third string rest on the port track in exactly the same position as the second string lay on the cut-off, and as it would have lain on the starboard track, had all gone well. The result was to depress the bow of the float by just twice the turning moment which the maneuver contemplated. He had 10 cars on bridge and bow, instead of 5, and that proved too much. In considering how he should avoid giving her too great a list to port, he forgot all about setting her down by the head, and this was the cause of the trouble. As she sank she had a slight list to port, due to the fact that the second string was still on the cut-off and did not exert their proper turning moment to starboard.

Obviously Meyers' proper way, and his only way, was to pull off the second string before he put any on the third track, even if he had to do this by twos or even ones. This was an awkward and troublesome method, but it was the only safe one, and to disregard it was to expose the float to an unnecessary danger. That she yielded enough to put a hatch under water

does not seem to me evidence that she was not seaworthy, or that she was not able to endure the risks inherent in her calling.

Decree for libelant on libel, and for respondent on cross-libel.

S. C. Pratt, of New York City, for appellant.

Foley & Martin, of New York City (W. J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellee.

Before COXE, Circuit Judge, and VEEDER and MAYER, District Judges.

MAYER, District Judge. On December 8, 1911, car float No. 9 of the Terminal Company was sunk while being loaded at a float bridge of the Lehigh Valley Railroad Company by Meyers, the conductor of the railroad company. It was contended below that the accident was due to the unseaworthiness of the float, and that, if there was an error by the conductor in the method of loading, that error was purely one of judgment for which the railroad company should not be held liable. The charge that the car float was not seaworthy has now been abandoned.

The manner in which the conductor loaded the float is not in dispute, although whether his method was prudent was the subject of some differences of opinion on the trial. Fifteen cars were to be loaded from the float bridge to the float. Thirteen of these cars weighed various amounts, but all above 70 tons each. The details of the handling of the train by Meyers are clearly and fully explained in the opinion of Judge Learned Hand and need not be here repeated. The result was that the weight was distributed so as to put the float down by the head, with the obvious consequence that the terminal company's float sank. We agree with the District Court that the conductor's method was negligent, and could readily have been avoided, and that the railroad company cannot be excused merely because the correct method would have required a little more time and trouble.

The decree is affirmed, with interest and costs.