### THE BARRENFORK.

### UNITED STATES v. VIRGINIAN RY. CO.

(District Court, E. D. Virginia. June 10, 1924.)

No. 3802.

**1. Wharves ⬥20(1, 5)—Liability for injury to vessel in coaling.**

The owner of a pier, in exclusive control of the coaling of a boat, owes the duty of exercising that degree of care reasonably required to load the coal, so that no damage shall ensue to the vessel, and is liable for damage caused by failure to exercise such care; but equally the owner of the vessel owes the duty of furnishing a seaworthy vessel, so that in the operation of coaling, if done in the exercise of ordinary care, no damage will ensue.

**2. Wharves ⬥20(1)—Capsizing of tug held due to negligent manner of discharging coal into bunkers.**

The capsizing and sinking of a new tug while being coaled at respondent's coaling pier *held* to have been caused by the negligent discharge of an excessive quantity of coal into the starboard bunker before commencing to fill the port bunker; also *held*, that alleged inflow of water through the ash hopper, when the tug listed, was not in sufficient quantity to constitute unseaworthiness or a contributing cause.

In Admiralty. Suit by the United States, owner of the steam tug Barrenfork, against the Virginian Railway Company. Decree for libelant.

H. H. Rumble, Sp. Assistant in Admiralty to U. S. Atty., Lester S. Parsons, Asst. U. S. Atty., and Charles A. McDonald, Admiralty Counsel U. S. Shipping Board, all of Norfolk, Va., for the United States.

Williams, Loyall & Tunstall (W. H. T. Loyall), Baird, White & Lanning (Edward R. Baird, Jr., and George M. Lanning), all of Norfolk, Va., for respondent.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

GRONER, District Judge. This is a libel on behalf of the United States, as owner of the steam tug Barrenfork, against the Virginian Railway Company, as operator of a coal pier at Seawell's Point, Va.

The Barrenfork is an ocean-going steam tug, 141 feet long, 27½ feet beam, equipped with a triple expansion engine of 850 horse power, with two boilers located on each side of the vessel forward of the engine room, and of about 418 tons gross.

On September 2, 1922, the tug, after touching at Newport News on a voyage from Boston, came over to the Seawell's Point coal pier of the Virginian Railway for the purpose of filling her bunkers. The master of the tug remained at Newport News to communicate with the Shipping Board by telephone, and the passage from Newport News to Seawell's Point was made under the command of the chief mate. Upon arrival at the coal pier, a little before 12 o'clock noon, the tug was made fast to the northern side of the pier. The mate went to the railway company's office to report, and to order 160 tons of coal put in the bunkers. He was requested to report to the dock master, who would instruct him as to a position for the tug at the pier. This he did, and by direction of the dock master moved his vessel to the south side of the pier and was assigned a berth. As finally located, the head of the tug was inshore, with her port side to the pier, and she was made fast by a bow line, stern line, and spring line. The tide was ebb.

The tug was a comparatively new vessel, thoroughly and fully equipped for the service in which she was engaged. Her bunker capacity was 250 tons, and her bunkers had in them at the time she docked about 80 tons of coal, 40 in each bunker, and she was then on an even keel. In the bow of the tug is located the fo'castle, next to which is the bunker hold, separated from the fo'castle by an iron bulkhead extending athwartships. Another iron bulkhead separates the after part of the bunker hold from the fire room, and at the bottom of the bulkhead there are sliding doors, through which the coal is handled for use in the furnaces. There is, however, a difference in the construction of the bulkheads in this tug and the ordinary tug, in that the bunker hold is divided, longitudinally, by an iron bulkhead running fore and aft and extending from the keel to the main deck, the result of which is to create two bunker holds, one on the starboard and one on the port side of the vessel. There is a hatch extending from the main deck to the top of the deckhouse of the tug, probably 9½ feet high, and located about the middle part of the bunker hold, just abaft the pilothouse. It was through this space that the coal was dumped into the bunkers.

The Virginian Railway Company, as already stated, is the owner of the coal pier. The pier extends from the eastern side of the Elizabeth river into the river a distance of 1000 feet or more, and on it is an elevated double track to accommodate the cars of coal, which are drawn up on the pier and dumped through iron chutes extending from each side of the pier at any angle at which it is desired to flow the coal, the result of which makes them adjustable to the height and breadth of the vessel to be coaled. As a general rule, however, it is about accurate to say that the angle at which the chutes extend from the top

of the pier is around 40 to 45 degrees, dependent, of course, upon the distance from the side of the dock of the vessel or the particular part of the vessel into which the coal is to be dumped. The mouth of the chute, at the time of the operation in question, was about 4 feet above the coal hatch. The height of the pier from mean low water is approximately 75 feet. When a car of coal reaches the point on the trestle at which it is intended to dump, its bottom is opened and the coal flows into a pocket, thence into a chute, and thence into the vessel. In this process it was usual for a part of the coal to stick in the pocket, and this could only be dislodged by long steel poles. The officials of the railway company estimate that the amount of coal which was thus retained until the coaling process was completed was approximately 18 tons. The significance of this will appear later.

In the process of coaling, the Barrenfork capsized and sank, and it is contended on behalf of the United States that this was due to the negligence of the railway company in the manner in which she was coaled, in that an unusual and unnecessary quantity of coal was dumped into her starboard bunker, so listing her to starboard that her decks became awash, and that sea water flowed into her hold through her bunker holes on deck, and ultimately through the engine room door into the fireroom, and that this, together with the undue load of coal on the starboard side, caused her to capsize. The railway company denies there was any negligence in the manner in which the vessel was coaled, and attributes the capsizing to the fact that the tug was unseaworthy, in that the fastenings to her ash hopper, located on the starboard side of the tug in the fireroom, were so defective that the top of the ash hopper could not be securely fastened down, as the result of which sea water from the ash ejector hole was allowed to flow into the engineroom in such quantity as to cause the sinking.

Nearly 1000 pages of evidence were taken, and expert witnesses of great learning and unimpeachable character were introduced in support of this theory. To undertake to analyze the evidence in detail would accomplish, in my opinion, no good purpose, and would certainly not tend to a clarification of the issues. What I shall have to say, therefore, on the subject epitomizes as a whole the evidence which I consider as helpful and illuminating in reaching a correct conclusion.

[1] Undoubtedly the railway company, as the owner of the pier and in exclusive control of the coaling of the boat, owed the duty of exercising that degree of care reasonably required to load the coal so that no damage would ensue to the vessel. If it failed in this respect, and its failure was the proximate cause of the damage, it should be held liable. On the other hand, and equally, the owner of the vessel to be coaled owed the duty of furnishing a seaworthy vessel, so that in the operation of coaling, if done in the exercise of ordinary prudence, no damage would ensue. See Lehigh Valley Railroad v. Terminal Co., 234 Fed. 310, 148 C. C. A. 212; United States Metals Refining Co. v. Jacobus, 205 Fed. 896, 124 C. C. A. 209.

[2] It will be seen at once, therefore, that the decision of the case depends upon a question of fact. The tug, as I have already said, arrived at the pier about 12 o'clock. Between that time and 2 o'clock

she had berthed, as directed, the coal chute was put in place, her hatch covers removed, and about 2 o'clock the coal began to flow. The railway company, as is customary, and as is provided in its schedule of charges, had furnished coal trimmers, whose duty it was to trim the coal dumped into the bunkers, so that the same should be evenly distributed. To enable this to be done it is the custom to remove sufficient of the bunker plates to enable the trimmers to get into and out of the hold. On the occasion in question the after bunker plate on the starboard side was removed. The car of coal which was to be dumped contained approximately 103 tons, and, assuming that 18 tons remained in the pocket, 85 tons were dumped into the tug. There is considerable conflict as to how much was dumped on the starboard side, and how much on the port side; but there is no real conflict, and such as there is should be ignored, that when the coaling began the angle of the chute was such as to cause the coal flowing from it to fall entirely into the starboard bunker. The railway company provides a man on the pier who has control of the dumping operation, and a method obtains by which the coal can be dumped fast or slowly.

In the case of the Barrenfork, the coal began to flow, as I have already stated, into her starboard bunker, and within five minutes after it started she had taken an unusual and dangerous list to starboard. Just a little while before the dumping began, the chief mate and the chief engineer had left the vessel to post some letters and buy some magazines at a nearby store, leaving the second mate in command. The master of the tug, in the meantime, had come over from Newport News and was standing at the shore end of the dock near a telephone booth, waiting for an opportunity to telephone. While in the booth, he could see the tug and the flow of the coal, and, observing the dangerous list of the vessel, he immediately went down the pier and to the tug. When he arrived at the side of the vessel most of the crew, including the second officer, the second engineer, some of the oilers, and some of the firemen, had left the vessel and were on the dock. The mate reported to the captain that he had protested against the method of coaling the tug. The captain went aboard the tug and down the starboard side of her main deck, where he found that she had taken such a list that water was coming on the deck through her scuppers. He hurried back to the dock and directed the man in charge of the coaling to straighten the boat up by dumping the coal on her port deck, and at the same time ordered the doors on that side of the tug closed, so as to accommodate the coal on deck and prevent its spread.

Here there is another conflict in the evidence, but out of this conflict I think may be deduced the fact that, while the flow of the coal was stopped momentarily, it began again, doubtless in an effort to throw it into the port bunker, but too late, for almost immediately thereafter the lines parted, the tug rolled over on her side until the starboard rim of her funnel struck the water, when she straightened up a little and settled down on the bottom. The whole operation had occurred in less than 20 minutes. The foreman of the dock, according to his own testimony, was not present when the coaling began. He was engaged in some other work on the dock when he noticed the list of the tug

300 F.—24

and changed his direction and went aboard of her. He went up from the main deck to the top of her house to the bunker hatch, and claims to have found the coal trimmers in the act of diverting the coal into the port bunker by the use of boards. All the remaining coal from that time, according to his evidence, was dumped on that side, without effect in righting the vessel or in checking the increasing character of the list to starboard. He thereupon left the vessel and went to the telephone to order another car, intending, doubtless, to dump its contents into the port side, with the expectation that the vessel would thus be brought back on an even keel, but before he returned, or the coal arrived, the damage was done.

The witnesses for the railway company insist that of the total quantity of coal dumped, namely, 103 tons, only 85 at the most was received on board the vessel, and of this amount they estimate, in varying quantities, but approximately, about 60 per cent. went into the starboard bunker and about 40 per cent. into the port bunker. But all the trimmers agree that considerably before the vessel sank the coal received in the starboard bunker extended to the top of the hatch; and more significant and unanswerable than any of this is the testimony of the diver of the Merritt Wrecking Company, in charge of the underseas operation in raising the vessel, to the effect that it took 3½ days to pump out the coal from the starboard bunker and only half a day to pump out the coal from the port bunker. It is undoubtedly true that it is not unusual for ships, both steam and sailing, in receiving coal at a coal pier, to take a list in the direction in which the coal flows, and it is equally true that this list is corrected almost immediately, either by the distribution of the coal by trimming, or by a change in the direction of the flow of the coal into the vessel.

The accident in the present case is most unusual; but examinations of the boat as she lay on the bottom and after she was raised disclosed no cause for the sinking, unless the flow of the water through the ash hopper, to be hereafter dealt with, was such a cause. She was tight and staunch throughout. It is true, as already stated, that one of her deck bunker plates on her starboard side was open; but this was necessary and usual to enable the trimmers to have access to the bunker space. It is also true that one or two of the port holes in the fo'castle were found open; but this does not explain the sinking, because the bow was well up out of the water until the boat was completely on her side. It follows, therefore, inevitably, that the loading of the coal produced a list of the vessel to starboard to such an extent that it was impossible to restore her equilibrium in time to save her, and the only further question is whether this condition was so accentuated, and the effort to bring her back made so abortive, by the flow of water into the vessel through a defective ash ejector, as to make this either a primary or contributory cause of the sinking.

In an effort to show that the Barrenfork capsized as the result of this defective ash ejector, there was produced in court a model, made to scale and weighted and balanced, according to the evidence of the expert, to behave in all respects as would the tug under like conditions, and interesting experiments were made in the presence of the court

in an effort to demonstrate this theory. In the conclusion at which I have arrived I take no issue with the experts in the matter of their calculations and conclusions. It is sufficient to say that their evidence is predicated upon a state of facts which, I think, is not sustained by the evidence. The ash ejector, as its name indicates, is a contrivance to discharge the ashes at sea. It consists of a hopper, located on the floor of the fireroom, into which the ashes are dumped, and through the bottom of which they are expelled by means of a pipe about 5 inches in diameter extending upwards, along the skin of the ship, to a point between the guards on the starboard side and penetrating outboard, from 1½ feet to 3 feet above the water line, dependent upon the draft of the vessel at the time. When the Barrenfork tied up at the Virginian Railway pier, her forward water tank was empty and she had a little less then one-third of her coal capacity aboard. The outlet of the ash ejector pipe at the time was therefore fully 3 feet above the water line, and about 1½ feet below the main deck. With a list of from 12 to 15 degrees, this hole would be below the water line, and by general consent the list taken by the Barrenfork within 5 to 10 minutes after the coal began to flow was at least this much, probably more,

The ash hopper is in appearance like an ordinary household toilet bowl, except that it is larger in circumference, being 19 inches long and 15 inches wide, and somewhat deeper, and is made of cast iron, instead of china or porcelain. The top or covering is like the top or covering of an ordinary toilet bowl, in that it works on hinges from the rear, but is different, in that it is reinforced across the top by the extension of the hinges, and is fastened on either side and in front by fastenings, which consist of a swing bolt let into a cast iron insert bolted on the lid or top of the covering, with a lug, or dog, which, by a screwing process, can be made tight. Around the outer edges of the lid is fastened a rubber gasket, so as to make a water-tight joint, and when the lugs or dogs are fastened down there is no escape of water. In the case of the Barrenfork, the ash hopper was in good condition in all respects, except that the dog or fastener of the front screw bolt had been lost, and there was no method of fastening or tightening this particular bolt.

The railway company, in its defense, first claimed that the lid of the ash hopper was entirely up, as a result of which, of course, there would have been no obstruction to such flow of the water as the pipe would accommodate, and the evidence of three witnesses was introduced to support this theory, and their testimony, if true, would lead to the conclusion that this was primarily the cause of the trouble. But I reject their evidence in toto, for not only is it shown that they had made previous statements to the officials of the Shipping Board in conflict with their later statements as to the condition of the ash hopper, but the utter inaccuracy of their statements that the lid was up and could not be closed is shown by the fact that, when the ash hopper was examined by the diver, while the vessel was on the bottom, it was found fastened down with the two side bolts in place; and this is further confirmed by the testimony of several members of the crew, who were in the fireroom, after the tug had heeled over sufficiently

far to submerge the ejector pipe, who testify, not only that the lid was in place, but that there was then no water coming through the opening and none on the engine room floor. When the vessel was finally raised, the hopper was the immediate objective of those who were engaged in looking for the trouble, and it was found as described by the diver. Hence it follows, of course, that the testimony of these men in this respect must be rejected.

The railway company, however, insists that, notwithstanding the lid was down, there was still an aperture or opening between the rim of the bowl and the lid, due to the failure of the front fastener to work, that permitted the flow of water, which the experts estimated at approximately three tons a minute. An ash hopper, said to be that of the tug Barrenfork, was produced at the trial and examined by the court, by witnesses, and by counsel. The testimony was that it had been brought from a shipyard in South Carolina, at which the Barrenfork had been overhauled after she had been sold by the government and converted from a coal to an oil burner. Assuming it was the same ash hopper in use on the tug at the time of the sinking, its condition had undergone certain physical deterioration, the precise extent of which, of course, it is impossible to determine. But, admittedly, when exhibited in court it had a broken lug on the left-hand side of the cover, which made it impossible to tighten the dog or fastening bolt, as would have been true if this defect had not existed. The rubber gasket, too, which was comparatively new at the time of the sinking, had been considerably mashed down and spread out.

Capt. Leitch, a witness for the railway company, and a marine surveyor of large experience, made an examination of the ash hopper coincidentally with the raising of the tug. In company with Capt. Wood, also representing the railway company, and two or three other persons representing the Shipping Board, he went into the fireroom as the tug came to the surface, and before there was opportunity for any change in the condition of the hopper, and found, according to his testimony, that the fastener opposite the hinge, which I have heretofore spoken of as the front fastener, was not secured, although the swing bolt was in a perpendicular position in the recess or insert of the lug. The fastener on the lid on the left-hand side, as the witness found the hopper, was fastened down, so that it required a tap from a hammer to loosen it. The one on the opposite side was in place, but was not tightly fastened down, so that by slightly striking it with the hand it would fall out of place. Capt. Leitch described this particular bolt as effective in keeping the covering on the ash hopper down and closed, but as ineffective in accomplishing the tightening necessary to make a water-tight joint.

The witness further testified that, after he had displaced the two side clamps or fasteners and lifted the lid, he closed it again and put the fasteners back in the position in which they were, and then ran his finger tips around the rim of the ash hopper bowl, between the top of the bowl and the gasket, and that he could get his finger tips to a slight extent in between the gasket and the rim of the bowl. He appears to have been the only witness who made this critical examination at the

time the tug was raised or at any time thereafter. The others who were present saw him remove the fastener and replace it, but no attention was called by him to the alleged aperture between the lid and the bowl, and opportunity was thus lost for determining accurately the conditions found. But when the hopper was exhibited in court he undertook again to demonstrate that this was a fact, and, after placing the fasteners in the position in which he says they were at the time of his original investigation, having in mind, of course, the fact that one of the fasteners was in the meantime so broken as to be loose, but which, he says, did not affect the situation, and the demonstration undoubtedly proved the fact that there was some play in the lid, and that by lifting it as far as possible, with the clamps in the position in which he placed them, it was possible to insert a lead pencil between the bowl of the hopper and the lid at the front and for some distance on each side.

Assuming that the same aperture existed at the time the boat heeled over and immersed her ejector pipe, Mr. Norton, the marine architect of the Newport News shipyard, testified, as already stated, that approximately three tons of water a minute would have been taken in. He arrived at his figures by careful mathematical computation, estimating the aperture at the front of the bowl, or the point opposite the hinges, at five-sixteenths of an inch, gradually tapering to nothing at the point where the side clamps were fastened down. The area of this opening he figured at about half the area of the pipe, and with a head pressure of approximately 13½ feet, which he estimated was the vertical distance between the intake and the bottom of the ash hopper, he reached his conclusion as to the quantity of water that would pass. Whether the formula upon which this calculation is based took into consideration the reduction of the flow of water by air and dirt, or by the friction of water flowing through a pipe, is not quite clear; but, assuming that it did not, and allowing a 40 or 50 per cent. reduction for these causes, it still follows that, if all the conditions obtained as described by the witness, from a ton and a half to two tons of water per minute from this cause would have been discharged into the vessel. And the demonstration of the performance of the model under such conditions was persuasive, if persuasion is necessary, of what the effect on the equilibrium of the vessel would be with this volume of water flowing into her starboard side.

The trouble with the whole proposition, however, is that it is based wholly and entirely upon theory, and is supported by fact only to the extent of the testimony of Capt. Leitch as to the condition of the hopper when the vessel was raised. It is perfectly apparent that at that time no accurate measurement of the stated aperture, if there was any, between the lid and the hopper, was made. So anxious, apparently, was Capt. Leitch to retain his secret that he not only did not call the attention of the other surveyors present at the same moment to his discovery, but, beyond the experiment with his finger tips, he took no measurements of a substantial and practical kind, upon which a fair and reasonable calculation could be based. Nothing, it seems to me, would have been easier than to have determined then and there, by

physical examination and accurate measurements, whether there was sufficient play between the lid and the hopper bowl to admit a flow of water of any considerable extent, and to determine likewise precisely the extent. Instead of doing this, the only witness who testifies on the subject contented himself by first removing the fastenings, which he found in place, on each side of the lid, and then replacing them as nearly as he could in the same position, and then inserting his finger tips between the lid and the bowl. That his fingers did not protrude beyond the gasket and into the bowl is perfectly apparent, and while it is true that his evidence was supplemented by the exhibit of the hopper and the ascertainment in court that there was an aperture, still the time between the sinking of the vessel and the production of this exhibit, the broken condition of one of the lugs, the mashed condition of the gasket, the general rusty and neglected condition of the hopper itself, and the fact that it had lain six months in the weather, leave much to be desired as to the conclusiveness of this test.

Unfortunately, in his zealous desire to protect the interests of his client and to guard a discovery which he deemed vital in explanation of the trouble, he withheld the information which, if frankly confessed at the time, would have demonstrated the accuracy or inaccuracy of his deductions. In saying all of this, I wish also to say that I have the highest respect both for his ability and for his sincerity, but to predicate a judgment involving a finding of gross contributory negligence upon such speculative evidence would be to substitute pure guess for reasonably certain facts. But this is not all. Excluding, as I do, as unworthy of consideration, the evidence of the firemen, the evidence of other members of the crew who were in the fireroom considerably after the dangerous list of the vessel occurred, and when, unquestionably, her ash ejector pipe was below the water line, is all to the effect that there was no water coming from the ash hopper and none on the engine room floor.

By universal consent, the last man to leave that part of the vessel was Peter White, the assistant engineer. The three firemen, who testified to the inflow of the water through the ash hopper, stated that they saw him waist high in water in a fruitless and vain effort to close the top of the ash hopper just before they left the tug. He emphatically denies all of this, and says that there was no water to stand in; and the overwhelming proof is that his clothes were perfectly dry as he stood on the dock as the tug finally sank. Nothing would have been easier than to have produced witnesses showing, not only that the clothes of the assistant engineer were wet, but that the clothes of the firemen, too, were wet, since they claim to have been standing in water 3 feet deep. The railway company had a number of its own employees at the scene of the sinking. More than half a dozen of them testified in this case, and yet not one of them claims to have seen what would have been perfectly obvious to all. In addition to this, it would have been impossible for men to have stayed in the fireroom with water 3 or 4 feet high, for if this condition had obtained the water would have gone into the fire box of the boilers, and the steam which would have resulted from this contact would have made it impossible for any person

to have remained in the place, and the hissing noise from the steam generated from this cause would have been heard all over the vessel. The most painstaking examination of the evidence, therefore, leads me to believe that, beyond peradventure, the effort to show that the defective ash hopper was the cause, or a contributing cause, of the sinking, should be rejected.

That the tug took water is undoubtedly true, and that this volume of water caused her finally to capsize is equally true; but the explanation of this is simple. In the preparation for coaling it was necessary to remove at least one of the deck bunker plates. This was located approximately at the point of her deck nearest the water line. When she heeled sufficiently far to put her decks awash, the water unquestionably flowed into this bunker hold and added its weight to the weight of the constantly flowing stream of coal to influence further her list to starboard. Only Herculean efforts at this point could have saved her. If another car of coal had then been available, and if the coal chute had been immediately adjusted to throw coal on her port deck, the effect might have been to right her sufficiently to relieve the pressure of water on her starboard side. The opportunity was not at hand, and the inevitable occurred. That it was not negligence on the part of those in charge of the ship to remove the bunker plate, I think, is perfectly clear. Confessedly, this was the only means of access to the trimmers, for, as already stated, the flow of coal into the bunker hatch had completely blocked ingress or egress to and from the bunker hold by this means; and that this should happen was inevitable. The men whose duty it was to distribute the coal required light and air, and a means of egress in the event of trouble. These were furnished through the bunker hold opening. That it was never anticipated nor contemplated that the vessel would be given such a list as to put her decks awash, and thus render the intake of water through the bunker hold a danger to be anticipated, is, I think, too clear for argument.

On the whole case, therefore, my conclusion is that the sinking occurred as the result of the negligence of the railway company, through its employees, in the performance of a duty in which in the exercise of reasonable care no damage should have ensued. I am convinced that practically the entire 85 tons of coal dumped on the day of the disaster went into the starboard bunker, and that, in the exercise of ordinary care, no more than half of this quantity should have been put there until a corresponding amount had been put in the other side.

A decree will therefore be entered, finding in favor of the libelant, and the ascertainment of damages will be referred to a master for report.