## VIRGINIAN RY. CO. v. UNITED STATES.

## THE BARRENFORK.

(Circuit Court of Appeals, Fourth Circuit. June 8, 1926.)

No. 2419.

**1. Wharves ⬳20(7).**

Where sinking of tug was due to negligence of owner of pier, who refused to aid in necessary raising, owner may recover actual amount expended therefor in exercise of reasonable diligence and good faith.

**2. Wharves ⬳20(7).**

Where wrecking company required owner to furnish men familiar with boat during raising operation, wages of men furnished are proper part of damages sustained from sinking of the boat at defendant's pier.

**3. Wharves ⬳20(7).**

In absence of showing that items paid wrecking company for raising tug were not made in good faith or due diligence, owner is entitled to recover therefor against owner of pier responsible for sinking.

**4. Wharves ⬳20(7).**

Amount of profit made by wrecking company, contracted for and paid by owner to have tug raised, may be recovered against owner of pier responsible for sinking.

**5. Wharves ⬳20(7).**

Interest on amount of recovery against owner of pier for sums expended in raising tug sinking of which was due to such owner's negligence, is recoverable from time items were actually paid.

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Suit by the United States, owner of the steam tug Barrenfork, against the Virginian Railway Company. From the decree (300 F. 366), both parties appeal. Affirmed in part, and in part modified.

Edward R. Baird, Jr., of Norfolk, Va. (E. W. Knight, of Charleston, W. Va., C. C. Burlingham, of New York City, Williams, Loyall & Tunstall, Baird, White & Lanning, W. H. T. Loyall, and George M. Lanning, all of Norfolk, Va., on the brief), for appellant and cross-appellee.

H. H. Rumble, Sp. Asst. U. S. Atty., of Norfolk, Va. (Paul W. Kear, U. S. Atty., and Charles A. McDonald, Dist. Atty., U. S. Shipping Board, both of Norfolk, Va., on the brief), for appellee and cross-appellant.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

ROSE, Circuit Judge. The tug Barrenfork belonged to the United States. She was worth $50,000. On the 2d of September, 1922, she had need of bunker coal, and came for it to the Sewell's Point pier of the Virginian Railway, for brevity herein referred to as the Railway. While the servants of the railway were putting coal upon her, she sank. She was subsequently raised, and at a fairly conducted public sale brought only a trifle over $20,000. While she was on the bottom, she obstructed or prevented approach to the pier, and lay so close to it that it was impossible to blow her up without grave danger of doing great damage to the pier itself. The railway was insistent that she should be speedily removed, so that it might have the full use of its pier. It disclaimed all responsibility for the sinking, and refused to take any part in the raising, or to give any advice as to how it might best be done, or who should be employed to do it. The government arranged for the raising and paid for it. By the libel, which started the present proceedings, the United States sought to recover from the railway the sums the raising actually cost it, as well as for damage done the tug, and some other miscellaneous losses and expenses, such as the damage to the effects of the crew, the costs of surveys, and so on. The decree below awarded it $97,122.53, and the crew $2,053.87, which was some thousands less than it says it should have. Both sides have appealed, the railway, because it denies that it is liable at all, and because it says that, even if it is, the decree is excessive; the government, because it was not given all that it claims.

Such of the facts as bear upon the cause of the sinking have been stated in the opinion of the learned District Judge, reported in 300 F. 366. They need not be here repeated. We are at one with him that the

tug was sunk by the negligence of the employees of the railway, and that it must answer for the loss thereby occasioned. Further discussion of that branch of the case will serve no useful purpose.

After the entry of the interlocutory decree declaring that the railway was solely at fault, the cause was referred to a commissioner, to ascertain the extent of the damage done. After prolonged hearing, he made a careful, able, and elaborate report. There were numerous exceptions by each side, and after full hearing the learned District Judge confirmed it, except as to two items of substantial, but comparatively minor, importance. These appeals followed.

No question is here made as to so much of the findings of the court below as have to do with the impairment in the value of the tug, or with a number of incidental expenses resulting from her sinking. Her value before she sank is admitted. It is agreed, at least tacitly, that after her raising it was better to sell than to repair her, and that the price realized for her was an accurate measure of her worth in her damaged condition. It is not denied that the government actually spent for raising her all that it claims, but it is said that much of this outlay was improvident, and cannot be recovered from the railway. Had the tug sunk in mid-ocean, the government's recovery would have been limited to her agreed value, $50,000, with the possible addition of a very few minor items of expense resulting therefrom. The decree below is for nearly double that amount, and the government asserts, and not without plausibility, that it should have been still larger. What are the peculiar circumstances which are said to justify and require so large a decree?

In the first place, there is the locality of the sinking. Had the tug gone down, where her presence on the bottom would not have been an obstruction to navigation, her owner could have abandoned her. Where she sank, that course was not possible. The railway would have been the principal sufferer from it. It was properly insistent that the tug should be removed as speedily as was possible. As already stated, she lay so close to the pier that any attempt to blow her up would have endangered that valuable structure. She had to be raised. There was no alternative. Moreover, she was lying in such a position, with relation to the pier and the bottom, that it was not probable that she could be raised without the use of powerful wrecking appliances, few of which could

be found on the Atlantic coast. Upon reasonable and diligent inquiry, the government in good faith satisfied itself that only those belonging to the Merritt & Chapman Derrick & Wrecking Company, hereinafter called the wrecking company, were available, and that the latter would not name a lump sum at which it would undertake the raising. The only contract into which it was willing to enter was one by which it was to be paid certain definite sums per day for the services of its various grades of employees and the use of certain specified machines, tools, and appliances.

[1] The government consulted, or attempted to consult, the railway as to what should be done. The latter, however, declined, as has already been stated, to give any advice on the subject, consistently adhering to its position that it was not responsible for the accident, and that it was up to the government to get the tug out of the way of its pier. As to how that might be best done was no concern of its. In these circumstances, the government, in good faith and after the exercise of reasonable diligence in seeking better terms, accepted the offer of the wrecking company and entered into the contract proposed by the latter, as both the commissioner and the District Judge in effect found, and as we think rightly. Upon all the evidence, we are satisfied that as a practical matter it had no other choice. The railway declined to suggest any. The conditions being as they were, the amount to the payment of which the contract obligated the government; and which it actually paid, is recoverable by it from the railway, because it is part of the damage proximately caused by its wrongdoing. We have been favored with no authorities to the contrary, applicable to the special facts of the instant case, and we know of none. Of course, the government was bound to the railway to exercise good faith and reasonable diligence, not only in the making of the contract, but in seeing that it was carried out. It was not entitled to let the wrecking company waste time on the work, and so increase the number of days for which it was to be paid, or to collect for the use of more men or more costly apparatus than in good faith it should have used.

What has been already said disposes of what in dollars and cents is the greater part of the controversy. To apply its principles to some items a few more words will be needed.

[2] The commissioner deducted $4,007.50

from the sum the government paid the wrecking company for the services of the derrick commandant. The learned District Judge thought that this sum should have been allowed. So do we. On the other hand, the judge thought that the commissioner was wrong in his holding that the government was entitled to recover from the railway the wages of the master and of the engineer of the tug, whom the government, at the request of the wrecking company, kept on duty during the raising operation. In the opinion of the judge, the allowance on this score should have been confined to the wages of the master for one week. The contract with the wrecking company in effect called for the government's keeping in attendance one or two of its men familiar with the boat, so that they could furnish information from time to time as might be required by the wrecking company's men. We see nothing unreasonable in this requirement, and moreover the government was bound, as we have said, to use reasonable care to make sure that the wrecking company was working with due diligence and in good faith. We do not see how this duty could have been performed otherwise than by having some of its own agents on the ground. Their compensation was a part of the outlay necessarily and proximately resulting from the sinking. We have not been able to make sure what was the precise amount the learned District Judge deducted from the commissioner's finding on this account, but, whatever it was, it should be added to the amount of the decree below. [3–5] The government appeals from the disallowance by the commissioner and the court of some ten items of the government's claim, amounting in all to $5,603.21; $4,812.88 of this total is deducted from the per diem charges of the wrecking company for certain items of its equipment and the services of its wreckmaster. As to some of those items, the commissioner finds that the government was bound to pay them, but that the railway is not liable to reimburse it. There is no finding that the government, in paying any of them, failed in either good faith or due diligence, and under the circumstances we think they should have been allowed. One item of 15 per cent. on disbursements of $4,003.51 made by the wrecking company was disallowed by the commissioner, on the ground that it represented profit to that company. So it did, but it was profit which it had contracted for, and was part of the money the government was forced to pay in order to have the tug raised. We think it should have been allowed. The

amount of these items should bear interest from the time they were actually paid by the government.

It follows that, while the railway company takes nothing by its appeal, on the cross-appeal of the government the decree below must be modified in the manner herein indicated. The costs in this court, as in the court below, will be paid by the railway company.